Filed 12/2/25  P. v. Corona CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ESTEVAN CORONA,<br><br>    Defendant and Appellant. | D084413<br><br><br>(Super. Ct. No. SCS321722) |

APPEAL from a judgment of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Estevan Corona appeals from a judgment after a jury conviction for gross vehicular manslaughter (Pen. Code,[1] § 192, subd. (c)(1) [count 1]) and hit-and-run causing death (Veh. Code, § 20001, subd. (b)(2) [count 2]).  The jury found true allegations that Corona fled the scene of the crime (Veh. Code, § 20001, subd. (c)) and that he personally inflicted great bodily injury (Pen. Code, § 1192.7, subd. (c)(8)).  The jury also found true two aggravating circumstances: that the victim was particularly vulnerable (Cal. Rules of Court,[2] rule 4.421(a)(3)) and that the crime involved sophistication or professionalism (rule 4.421(a)(8)).  On appeal, Corona argues: (1) the People committed a *Brady*[3] violation by failing to produce a former investigator's spreadsheet; (2) the trial court erred by precluding the defense from introducing third-party culpability evidence; (3) the court erred by admitting a photograph of the victim taken when she was alive; and (4) there was insufficient evidence to support the jury's true findings on the "particularly vulnerable" and "sophistication or professionalism" aggravating factors.

We conclude there was no *Brady* violation because Corona was not prejudiced by the absence of the investigator's spreadsheet.  We further conclude the trial court did not prejudicially err by excluding third-party culpability evidence or admitting the victim's photograph into evidence.  We affirm the jury's true finding on the "particularly vulnerable" aggravating factor but reverse the true finding on the "sophistication or professionalism" aggravating factor for lack of substantial evidence.  We therefore reverse the sentence and remand for resentencing without consideration of the invalid aggravating factor.  We affirm the judgment in all other respects.

---

1    Undesignated statutory references are to the Penal Code.
2    All further references to rules are to the California Rules of Court.
3    *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Collision*

On a sunny morning in March 2020, pedestrian B.A. was in the crosswalk of an intersection in Otay Mesa in San Diego County when she was struck and killed by a silver 2016 Nissan Altima running a red light.  The driver swerved before hitting B.A. with the front passenger side of the car, but he did not brake, slow down, or stop.  The driver sped away and another driver who witnessed the collision chased the suspect's vehicle in his own car for a couple minutes, but was unable to catch up despite "floor[ing] it."  The pursuing driver lost track of the fleeing Nissan Altima when it made a turn toward an area where junkyards are located, and he was unable to get a good look at the license plate.

B.A. was 21 years old when the collision occurred.  The medical examiner determined that she suffered numerous external and internal injuries on the left side of her body, and that she died from multiple blunt force injuries.

B.    *The Investigation*

During the investigation that followed, law enforcement reviewed surveillance videos and images showing that the suspect vehicle's license plate number was "7SBA922" and that the car had tinted windows and six-spoke aftermarket rims.  A records check on the license plate number showed that S&R Towing sold the vehicle at auction in October 2019 to Corona, who bought the car through his business entity, Cobra Motors.  Corona was a longtime and frequent customer of S&R Towing, purchasing about 45 vehicles and attending most of their auctions.  He often re-sold the

3

purchased vehicles on Craigslist.  However, after the collision, he abruptly stopped purchasing cars from S&R Towing.

Phone and cell site records showed that Corona was in the Otay Mesa area at the time of the collision.  The collision occurred at 9:11 a.m., and Corona called his wife at 9:13 a.m. from a location about one mile from the collision site.  Following that brief call, Corona exchanged multiple voice calls and text messages with his wife and one of his daughters over the course of the next 20 minutes.  Then Corona's primary phone line lost connection with his service provider's network for a 25-hour stretch, during which various numbers tried to call him, but the calls went straight to voicemail.

Corona's wife, daughters, and brother V.C. continued to exchange several phone calls with each other after Corona's phone was first disconnected.  Cell site data showed that the same afternoon after the collision, Corona's wife drove from Bonita, where their family resided, to Otay Mesa, and then back to Bonita.  One of Corona's daughters also drove to Otay Mesa and traveled within about one mile of the collision site.  A second phone line associated with Corona became active in the late afternoon, traveling from Chula Vista to Otay Mesa about a mile from the collision site, and then back up to Bonita.  Around the same time, V.C.'s phone disconnected from the network for about 90 minutes.

The morning after the collision, Corona's primary cell phone line reconnected to the cellular network, but his SIM card had switched to a different device.  That line was active until April 2020, when the line was canceled and service terminated.  Law enforcement was never able to recover the phone associated with that line.

Surveillance footage from several businesses near the collision site showed that the Nissan Altima incurred significant damage from hitting

4

B.A., including a shattered windshield, missing bumper parts, and a dislodged right-side mirror. Video from an auto business in the area showed that soon after the incident, the damaged Nissan Altima pulled into a nearby alley. Footage from around 5:00 p.m. the evening after the collision showed someone with the same distinctive tattoo as V.C. driving a 2014 Ford Fiesta belonging to Corona through the area, with someone resembling Corona sitting in the passenger seat. Several minutes later, the Nissan Altima was recorded leaving the Otay Mesa area followed immediately by the Ford Fiesta, and the Nissan Altima was being driven by someone resembling Corona who appeared to have been the passenger in the Ford Fiesta from earlier footage. In that video, the Nissan Altima had the same extensive damage to its right side that was captured in footage from the collision and its immediate aftermath. During the period covered by these evening videos, both V.C.'s and Corona's primary cell phone lines were temporarily disconnected from their provider's network, but Corona's secondary line showed he was in Otay Mesa within one mile of the collision site.

Text messages and documentary evidence showed that the next day, two days after the accident, one of Corona's daughters sold the Ford Fiesta on Craigslist to a third party, with Corona's guidance. Investigators determined that DNA collected from inside the Ford Fiesta matched Corona, but there was no match to V.C. The Nissan Altima was never found.

After law enforcement seized Corona's wife's phone pursuant to a search warrant, investigators discovered that in January 2021, several months after the incident but before Corona was charged, she ran an internet search querying whether Corona "ha[d] a warrant" for his arrest and included his first and last name in a search on the San Diego Sheriff's warrant search website.

5

## C. Evidentiary Disputes

The People charged Corona with gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1) [count 1]) and hit-and-run causing death (Veh. Code, § 20001, subd. (b)(2) [count 2]). The charging document included special allegations as to count 1 that Corona fled the scene of the crime (Veh. Code, § 20001, subd. (c)) and that he personally inflicted great bodily injury (Pen. Code, § 1192.7, subd. (c)(8)). The People also alleged that B.A. was a "particularly vulnerable" victim within the meaning of rule 4.421(a)(3) and that the offense was carried out with "planning, sophistication and professionalism" within the meaning of rule 4.421(a)(8).

In pre-trial motions in limine, the defense sought to exclude photographs of B.A. while she was living and sought to admit e-mails from Detective Gary Voss, a former investigator on the case, to the prosecution in which he stated that he "was convinced that the suspect was [O.B.]," an individual who was "in some way related to" Corona. In the e-mails, Detective Voss explained that O.B. had received toll violation tickets for a vehicle registered to Corona's daughter, that these tickets were recovered in a search of Corona's house, and that a Google search showed O.B.'s listed addresses matched Corona's. The People filed motions in limine to exclude, among other things, third-party culpability evidence and Detective Voss's e-mails.

During the first hearing on the motions, the court indicated its tentative ruling was to allow one photograph of B.A. before her death: a portrait-style picture of her, showing only her head and torso. After the defense said that the proposed picture was "fine" and presented no argument for excluding it, the court ruled it admissible. The photograph was later admitted into evidence at trial without objection.

6

As for Detective Voss's e-mails, the court found they were inadmissible hearsay, lacked foundation, and contained improper opinions and legal conclusions. At subsequent hearings, defense counsel informed the court that they did not intend to introduce any third-party culpability evidence. The defense made an oral *Brady* motion, however, upon speaking to Detective Voss and learning that he had created a spreadsheet not produced in discovery containing pictures and notes from his review of surveillance footage which led him to think that O.B. was driving the Nissan Altima at the time of the collision. The defense informed the court that they had subpoenaed Detective Voss and he had agreed to appear at trial.

In response, the People informed the court that to the extent the spreadsheet existed, it had not been uploaded to the police department's system and was no longer in the prosecution's possession. They argued, however, that the spreadsheet was not *Brady* material because its contents were limited to screenshots, time stamps, and Detective Voss's notes about what was occurring in one segment of video out of many. The prosecutor contended that even though there was no longer a record or copy of the spreadsheet, there was no *Brady* violation because the defense had received the underlying video, and any conclusions or opinions Detective Voss reached from observing the footage would be inadmissible.

The trial court heard testimony from Detective Voss outside the presence of the jury. Detective Voss explained that the spreadsheet contained screenshots of people and vehicles from about eight hours of video surveillance footage obtained from a business in the vicinity of the accident. Detective Voss identified one point on the video when he saw an individual that could have been O.B., but he was not certain. This was in the morning right after the accident. Detective Voss did not testify that the person in

question was in or near the Nissan Altima. He also did not explain how he was able to recognize O.B.

In further arguments on the *Brady* issue, defense counsel argued in the alternative that Corona should be permitted to present a third-party culpability defense. In response, the prosecutor argued that O.B. was not seen at the intersection where the accident occurred, but "multiple blocks away on foot, not near -- not seen driving the Nissan Altima and not near the Nissan Altima." The prosecutor also noted that this was "a business day . . . early in the morning" and there were "a ton of people coming in and out of these videos." In rebuttal, defense counsel did not dispute any of these facts.

The trial court found that Detective Voss's opinion regarding O.B. was based only on a brief portion of surveillance footage, with no indication of where this person was in relation to the Nissan Altima. The court also concluded that the information recorded in the spreadsheet had been provided to the defense in other forms, that the evidence was neither exculpatory nor impeaching, and that Corona suffered no prejudice from its absence. The court therefore concluded there was no *Brady* violation. The court further found that the evidence was insufficient to support a third-party culpability theory because there was "no positive identification" of O.B. and Detective Voss's opinion that "it may have been him" along with the toll violations was not enough.

### D. *Jury Instructions and Verdict*

The trial court instructed the jury on the two charged aggravating factors using CALCRIM No. 3226 for particularly vulnerable victims and CALCRIM No. 3230 on sophistication or professionalism. CALCRIM No. 3226 defines "particularly vulnerable" to include "being defenseless,

8

unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree." It also instructs that the jury "should consider all of the circumstances surrounding the commission of the crime, including the characteristics of [the victim.]" The instruction further states that the jury may not find vulnerability based solely on an element of the offense, and the jury can only find the allegation true if it agrees "that the People have proved that the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime."

CALCRIM No. 3230 instructs that to prove the sophistication or professionalism aggravating factor, "the People must prove that the defendant's manner of committing the crime involved sophistication or professionalism[,]" which "depends on the totality of the circumstances surrounding the offense." The instruction defines "sophistication" as referring "to conduct demonstrating knowledge or awareness of the complexities or details involved in committing the crime." "Professionalism" is defined as referring "to conduct demonstrating particular experience or expertise." The jury can only find the allegation true if it agrees "that the People have proved that the defendant's manner of committing the crime involved planning, sophistication, or professionalism." Also, as with the particularly vulnerable victim factor, to find the allegation true the jury must agree "that the People have proved that the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime."

The jury convicted Corona as charged on both counts and found true the charged enhancement. The jury also found true, as to both counts, the two aggravating circumstances described in CALCRIM Nos. 3226 and 3230.

9

*E.    Sentencing*

At sentencing, the People argued for an upper-term sentence. In addition to noting Corona's two prior prison terms, the prosecutor reprised arguments she made at closing in trial, noting that the jury found "the coverup" was "committed with sophistication or professionalism[.]" She highlighted the fact that Corona fled the scene, hid the car in a junkyard, and solicited help from his family members to "cover up the crime and destroy the evidence." The prosecutor also pointed to the fact that B.A. was "vulnerable" because she was "alone," "on foot," and "lawfully crossing in the crosswalk."

The trial court sentenced Corona to a total of 11 years, consisting of the upper six-year term for count 1, plus five years for the enhancement for fleeing the scene. The court found that although Corona had served two prior prison terms, it would not take them into consideration "due to the length of time that has passed since then[.]" The court then explained that after reviewing the factors listed in Penal Code section 1170, subdivision (b)(6), it found no justification for imposing the lower term. The court said it considered, among other things, the impact of the crime on B.A.'s family and friends, the testimony of the witnesses to the collision, the way the car hit B.A. and then fled the scene, and the way in which Corona and his family were able to "successfully hide" Corona and the car. The court concluded that the aggravating factors "far outweigh[ed] any mitigating factors" and that the upper term was appropriate. The court also stated that it "would not, even if it had a choice, strike the five-year enhancement" under Vehicle Code section 20001, subdivision (c). As to count 2, the court imposed the upper term of four years but stayed the sentence pursuant to Penal Code section 654, which prohibits multiple punishments for the same act.

DISCUSSION

I

We begin by addressing Corona's arguments regarding Detective Voss's spreadsheet and e-mail communications because they both relate to the issue of third-party culpability in this case.  Corona first contends that the lost spreadsheet was *Brady* material because Detective Voss's opinion that O.B. was the primary suspect "was a product of his review of the spreadsheet[.]"

We review a claim of *Brady* error de novo "but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)  Under *Brady*, the prosecution has an obligation to disclose to the defense all material exculpatory evidence.  (*Brady, supra*, 373 U.S. at p. 87.)  There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  A defendant establishes prejudice by showing the evidence was material, i.e., if the evidence had been disclosed, there is a reasonable probability that the result of the trial would have been different."  (*People v. Wilson* (2020) 56 Cal.App.5th 128, 160 [cleaned up].)

Even assuming Corona can meet the first two *Brady* prongs, he has not established that he was prejudiced by his inability to access the spreadsheet.  Defense counsel had the opportunity to speak with Detective Voss and hear his testimony about what the spreadsheet contained.  The defense acknowledged at a pre-trial hearing that the prosecution produced the underlying evidence contained in the spreadsheet, including the video footage from which the detective took screenshots to attach to the

11

spreadsheet. Defense counsel also acknowledged that to the extent Detective Voss included his own notes, they consisted only of what he observed, not his thought processes. And if Detective Voss reached a conclusion or had an opinion, defense counsel conceded his personal opinions were not relevant and that the evidence contained in the spreadsheet had "been made available to everybody[.]" Moreover, Detective Luis Benavides had documented Detective Voss's observations in a report and included a screenshot of the individual whom Detective Voss identified as O.B. This report and Detective Voss's e-mails were produced in discovery. In these circumstances, we conclude it is not reasonably probable that the jury would have reached a different result if the prosecution had produced Detective Voss's missing spreadsheet. Accordingly, there was no *Brady* error requiring reversal.

In resisting this conclusion, Corona cites to *People v. Son* (2020) 56 Cal.App.5th 689, 691, in which the Court of Appeal held that a detective's narration of events in a surveillance video was admissible lay testimony. But even if the spreadsheet is equivalent to a detective's narration of video footage, that would not necessarily make it material for *Brady* purposes. The video footage itself was the evidence, and the defense had full access to it. Corona has failed to establish that the spreadsheet contained anything other than screenshots, observations from the video footage, and Detective Voss's own opinion, which was documented in a report by Detective Benavides and produced in discovery along with Detective Voss's e-mails. Thus, no material evidence was withheld from the defense.

Corona's argument regarding the trial court's exclusion of Detective Voss's e-mails is unpersuasive for similar reasons. We review the trial court's evidentiary decision for abuse of discretion. (*People v. Chhoun* (2021) 11 Cal.5th 1, 26; Evid. Code, § 352.) Under this standard, " 'a trial court's ruling

will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)  Here, Corona does not explain how the e-mails did not constitute inadmissible hearsay.  (Evid. Code, § 1200, subd. (a) [defining hearsay as out-of-court statement offered for truth of the matter stated].)  Detective Voss's personal opinion as to the identity of the driver was also an inadmissible opinion as to guilt or innocence.[4]  (*People v. Torres* (1995) 33 Cal.App.4th 37, 46–47.)

Corona argues that the e-mails were "the only means" of presenting a third-party culpability theory to the jury and that their exclusion "violated his rights to present a complete defense, and to due process."  But application of the ordinary rules of evidence generally does not infringe on a defendant's constitutional right to present a defense.  (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.)  As defense counsel acknowledged, Detective Voss made himself available to speak with the defense and to testify at trial if called.  Nothing prevented the defense from reconstructing the factual basis for the opinion expressed in Detective Voss's e-mails.  And importantly, as we discuss further below, there was insufficient evidence–even if Detective Voss's e-mails had been deemed admissible–to justify allowing the defense

---

4      If a detective has sufficient familiarity with a suspect, he may offer a lay opinion identifying someone depicted in a surveillance videotape as the suspect.  (*People v. Leon* (2015) 61 Cal.4th 569, 600–601.)  Detective Voss never explained how he was familiar with O.B. and did not definitively identify him as the person depicted on the surveillance video.  And even if his uncertain identification of O.B. had been admissible, there was still no foundation for him to express an opinion that O.B. was the driver of the Nissan Altima as he did not claim to have seen O.B. driving the vehicle on the videotape.

to present a third-party culpability theory to the jury. We thus discern no abuse of discretion in the exclusion of the e-mails.

Lastly, we conclude the trial court did not abuse its discretion in determining that evidence of O.B.'s link to the crime was too speculative to warrant allowing the defense to present a third-party culpability theory. For third-party culpability evidence to be admissible, " 'there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*People v. Avila* (2006) 38 Cal.4th 491, 578, quoting *People v. Hall* (1986) 41 Cal.3d 826, 833.) "[E]vidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime." (*People v. Brady* (2010) 50 Cal.4th 547, 558.) Where the third party's link to a crime is "tenuous" or "speculative," the trial court is not required to admit the evidence. (*People v. Turner* (2020) 10 Cal.5th 786, 815–818.)

After initially disclaiming any intent to argue third-party culpability, the defense revived the discussion during arguments on the *Brady* issue in connection with Detective Voss's spreadsheet. In support of their argument for a third-party culpability theory, the only evidence the defense cited was Detective Voss's opinion that footage showed O.B. in the collision's vicinity, and that toll violation tickets bearing O.B.'s name were found in Corona's residence. As noted, Detective Voss's opinion was that a person in the surveillance footage "could have been" O.B. He admitted he was not certain and did not know if O.B. had access to the Nissan Altima. According to the prosecutor's unrefuted argument below, the person Detective Voss identified as possibly being O.B. was seen on foot multiple blocks from the collision and

14

was not driving or near the Nissan Altima. There was no direct or circumstantial evidence tying O.B. to the Nissan Altima or identifying him as the driver. An individual's mere possible presence in the vicinity, without any other evidence to somehow tie the individual to the crime, is insufficient. (See *People v. Brady, supra*, 50 Cal.4th at p. 559 [insufficient evidence to support third-party culpability where police received tips that a proffered third party resembled a composite drawing of the suspect, but no one identified the third party as the actual assailant].) As for the toll tickets, there is no indication that they were in any way connected to the commission of the crime. There is no evidence, for example, that O.B. was driving the Nissan Altima, or even the Ford Fiesta, at the time he failed to pay tolls or any other time. Nor does the record show he incurred those violations at a date, time, or location that had any relevance to the collision. We thus cannot conclude that the court's decision to preclude a third-party culpability theory, given the paucity of evidence, resulted in a miscarriage of justice or a violation of Corona's constitutional rights.

## II

We next consider Corona's argument that the court prejudicially erred by admitting a photograph of B.A. from when she was still alive. Corona contends that the photograph "was not material to any issue in dispute" and prejudiced Corona because it was "sentimental."

As an initial matter, it is doubtful this issue was preserved for appeal because the defense agreed to the photograph's admission at a pre-trial hearing and then made no objection when it was admitted into evidence. (*People v. Partida* (2005) 37 Cal.4th 428, 433–434; Evid. Code, § 353, subd. (a).) But we also agree with Corona that the photograph had minimal relevance in this case, and we recognize that the California Supreme Court

15

has "repeatedly cautioned against the admission of photographs of murder victims while alive unless the prosecution can establish the relevance of such items." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.)

We need not decide, however, whether the court erred or the issue was forfeited because even assuming any error, we conclude it would be harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. " 'Under the *Watson* standard, the erroneous admission of a photograph warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 374.) The photograph, which merely depicts B.A.'s head and torso in a portrait format, is relatively neutral and does not contain elements that could be "calculated to elicit sympathy." (*People v. Thompson* (1988) 45 Cal.3d 86, 115 [photograph calculated to elicit sympathy might be one taken at church or with small children]; cf. *People v. Cooper* (1991) 53 Cal.3d 771, 821 [trial court admitted photographs but ordered that they not include family dogs to minimize prejudice].) Corona makes no specific argument, beyond describing the photograph as being "sentimental," that the photograph inappropriately aroused the jury's passion. Accordingly, we are not persuaded by Corona's assertion of prejudice and deem any error harmless.

## III

Lastly we consider Corona's argument that there was insufficient evidence to support the jury's true findings on the "particularly vulnerable" and "sophistication or professionalism" aggravating factors. While we conclude that there was substantial evidence to support the jury's finding as to B.A. being "particularly vulnerable," we agree with Corona regarding the

16

"sophistication or professionalism" factor and reverse that true finding and remand for resentencing on this ground.

>    A.    *Particularly Vulnerable Victim*

Corona contends that the fact B.A. was alone, on foot, and crossing lawfully within the crosswalk did not make her "particularly" vulnerable as contemplated by rule 4.421(a)(3). We review that jury's findings for substantial evidence, which means asking " 'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 271, quoting *People v. Mickey* (1991) 54 Cal.3d 612, 678.) "Particularly, as used [in rule 4.421(a)(3)], means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.) Victims may be rendered vulnerable by the nature of the crime itself, requiring a further finding that the victim's situation makes "the defendant's act especially contemptible." (*People v. Bloom* (1983) 142 Cal.App.3d 310, 321–322; see also CALCRIM No. 3226 [requiring a jury finding that "the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime"].)

Courts have recognized that a victim of gross vehicular manslaughter who has no warning or ability to take evasive action may be characterized as "particularly vulnerable" within the meaning of rule 4.421(a)(3). (See *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1182; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1321.) In *Nicolas*, the Court of Appeal affirmed the trial court's finding that a victim was particularly vulnerable because she was rear-ended on the freeway during the daytime when "she had the expectation

17

of safety." (*Nicolas*, at p. 1182.) In *Weaver*, the Court of Appeal concluded there was substantial evidence to support a finding that the victims were particularly vulnerable because the defendant collided with them while going in the opposite direction of traffic at night without headlights on. (*Weaver*, at p. 1316.) Here, a rational jury could find that B.A. had an expectation of safety while in the crosswalk with a working pedestrian traffic signal, during daytime hours, and with no warning or ability to evade Corona's vehicle because he did not even attempt to slow down. While it is true that all victims of gross vehicular manslaughter may be vulnerable in some sense (see *People v. Piceno* (1987) 195 Cal.App.3d 1353, 1358), when we consider "the 'total milieu in which the commission of the crime occurred[,]' " as we must, we conclude there was substantial evidence to support finding the "particularly vulnerable" victim aggravating factor to be true in these circumstances. (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1694.)

### B. Sophistication or Professionalism

We reach a different conclusion regarding the jury's true finding for the "sophistication or professionalism" factor. At trial, the People relied solely on evidence of Corona's actions *after* committing the offense to support this aggravating factor, arguing to the jury that Corona showed sophistication because he fled the scene, hid the car in a junkyard, and solicited help from his family members to "cover up the crime and destroy the evidence." The People acknowledge on appeal "that the collision itself did not involve sophistication or professionalism" and that "[t]here was no evidence or argument that the collision was planned or deliberate, and no evidence that [Corona] had any sort of experience or expertise concerning vehicle/pedestrian collisions." The People also acknowledge that Corona "was separately punished for fleeing the scene by way of the Vehicle Code

18

section 20001, subdivision (c) enhancement, and an upper term sentence cannot be imposed 'by using the fact of any enhancement,' unless the court has discretion to strike the punishment for the enhancement and does so." (Pen. Code, § 1170, subd. (b)(5); Rule 4.420(g).)  The People nonetheless assert that Corona's actions after the collision are sufficient evidence to support the sophistication or professionalism aggravating factor here.

We disagree.  By its own terms, rule 4.421(a)(8) applies when "[t]he manner *in which the crime was carried out* indicates planning, sophistication, or professionalism[,]" not a defendant's conduct afterwards.  (Italics added.) CALCRIM No. 3230 also expressly instructs that to prove this aggravating factor, "the People must prove that the defendant's *manner of committing the crime* involved sophistication or professionalism."  (Italics added.)  Even the instruction's definition of "sophistication" is tied to conduct involved "*in committing the crime.*"  (*Ibid.*, italics added.)  The plain language of both the rule and the jury instruction contemplate that the commission of the crime itself must have been sophisticated or professional, not actions occurring after the completion of the charged crime.

Cases that have analyzed this aggravating factor support our conclusion that only conduct leading up to or during the crime's ongoing commission is relevant, and the People cite no cases applying the factor to actions occurring after the crime's completion.  (See, e.g., *People v. King* (2010) 183 Cal.App.4th 1281, 1322–1323 [assault was "sophisticated, well-planned and purposeful" because officer defendant moved victim to an isolated spot, led her to believe the stop was legitimate by taking her driver's license and claiming to have run her plates]; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1262 [crime involved sophistication and planning where defendant provided his victims with movies and toys to "lull[] his victims into

19

acquiescence and silence by cultivating a 'friendly neighbor' relationship"]; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1759 [defendant showed planning in committing DUI offense when "he went to Mexico for the specific purpose of partying and he consumed a large amount of alcohol, as verified by his .24 blood alcohol content"]; *People v. Jones* (1992) 10 Cal.App.4th 1566, 1577 [affirming use of aggravating factor where "defendant lulled the victims' mother into a false sense of trust by initiating several visits before abducting the children, and by then taking the children in a manner designed to give him a head start before the mother would realize that anything was wrong, i.e., by taking them on the pretext of purchasing shoes for them"].) Accordingly, we reverse the jury's true finding as to this aggravating factor.

The People concede that if we conclude, as we have, that even one of the aggravating factors is not supported by substantial evidence, then we must remand the matter for resentencing under *People v. Lynch* (2024) 16 Cal.5th 730, 768. We agree and accept the People's concession. We express no view on how the trial court should exercise its discretion on remand or whether it should impose the upper term based on other aggravating circumstances. (See *id*. at p. 764 ["nothing in section 1170(b)(2) prohibits the court from imposing an upper term sentence based on a single, properly proven aggravating circumstance *if*, in the court's discretion, *that circumstance alone justifies*" the upper term sentence].)

## DISPOSITION

The jury's true finding on the aggravating factor for "sophistication or professionalism" is reversed for insufficient evidence. The sentence is

reversed and the matter is remanded for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.


                                                      BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.